# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **DRAPHER OMAR SHARIF** | } | |
| **BONMAN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No: 6:14-cv-01518-MHH** |
| | } | |
| **CAROLYN W. COLVIN,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. § 1383(c), plaintiff Drapher Omar Sharif Bonman seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied his claim for supplemental security income. After careful review, the Court affirms the Commissioner's decision.

## I.     PROCEDURAL HISTORY

Mr. Bonman applied for supplemental security income on June 21, 2011.[1] (Doc. 5-6, pp. 2-8).  Mr. Bonman alleges that his disability began on April 9, 2010. (Doc. 5-6, p. 2).  The Commissioner initially denied Mr. Bonman's claim on

---

[1] The ALJ stated that Mr. Bonman applied for benefits on April 29, 2011, but the record indicates that Mr. Bonman completed his application for supplemental security income on June 21, 2011. (Doc. 5-6, p. 2).  The discrepancy is immaterial to the Court's analysis.

August 29, 2011, and Mr. Bonman requested a hearing before an Administrative Law Judge (ALJ).   (Doc 5-5, pp. 7, 12-14).   The ALJ issued an unfavorable decision on March 1, 2013.  (Doc. 5-3, pp. 17-39).   On June 4, 2014, the Appeals Council declined Mr. Bonman's request for review (Doc. 5-3, pp. 2-7), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 1383(c).

## II.   STANDARD OF REVIEW

The scope of review in this matter is limited.   "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).   In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.   *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).   If the ALJ's decision is supported by substantial

2

evidence, the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Mr. Bonman has not engaged in substantial gainful activity since April 26, 2011, the alleged onset date.[2]  (Doc. 5-3, p. 22). The ALJ determined that Mr. Bonman suffers from lumbago, a severe impairment. (*Id.*).   The ALJ also concluded that Mr. Bonman suffers from the non-severe impairments of hypertension and diminished intellectual functioning.  (Doc. 5-3, p. 25).   Based on his examination of the medical evidence, the ALJ concluded that Mr. Bonman does not have an impairment or combination of impairments that meets or medically equals the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 5-3, p. 29).

Next, the ALJ determined that Mr. Bonman has the RFC to:

> understand, remember, and carry out simple but not detailed instructions for periods of two hours across an eight-hour day with routine breaks and to perform the requirements of light work as defined in 20 CFR 416.967(b) that requires no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling and no work at unprotected heights or around hazardous machinery.

(Doc. 5-3, p. 29).  Based on this RFC, the ALJ concluded that Mr. Bonman is not able to perform his past relevant work as a sider or as a machine laborer.  (Doc. 5-3, p. 34).  Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Mr. Bonman can perform, including night cleaner, label marker machine tender, and assembler.  (Doc. 5-3, pp. 34-35).

---

[2] Mr. Bonman alleges in his application for supplemental security income that his disability began on April 9, 2011, not April 26, 2011.  (Doc. 5-6, p. 2).

Accordingly, the ALJ determined that Mr. Bonman is not disabled as defined in the Social Security Act. (Doc. 5-3, p. 35).

## IV.   ANALYSIS

Mr. Bonman argues that he is entitled to relief from the ALJ's decision because (1) the ALJ erred in finding that Mr. Bonman does not meet the intellectual disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05B ("Listing 12.05(B)"); and (2) the ALJ did not give proper weight to the opinion of Mr. Bonman's primary treating physician, Dr. A.R. Beezley.[3]   The Court examines each issue in turn.

### A.   Substantial evidence supports the ALJ's determination that Mr. Bonman does not meet Listing 12.05(B).

Mr. Bonman argues that the ALJ erred at step three in the evaluation process by failing to find that Mr. Bonman meets Listing 12.05(B).   "To meet Listing 12.05 for [intellectual disability], 'a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22.'"   *Perkins v.*

---

[3] In the ALJ's decision, the ALJ uses the term mental retardation instead of intellectual disability.  When the ALJ issued his decision in March 2013, Listing 12.05 was the listing for mental retardation.  Effective September 3, 2013, the Commissioner replaced the term "mental retardation" with "intellectual disability" in Listing 12.05, but the change did not affect the substance or requirements of the listing. *See* Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46,501 (Aug. 1, 2013).  The Court discusses the listing using the terminology that the Commissioner adopted in September 2013 rather than the terminology in effect when the ALJ issued his decision.

*Comm'r of Soc. Sec.*, 553 Fed. Appx. 870 (11th Cir. 2014) (quoting *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).  "A claimant must meet these diagnostic criteria in addition to one of the four sets of criteria found in 12.05(A), (B), (C), or (D) in order to show that his impairments are severe enough to meet or equal Listing 12.05."  *Id.* (citing 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A)).   A claimant is presumed disabled under Listing 12.05(B), if the claimant meets the introductory diagnostic description and shows a "valid verbal, performance, or full scale IQ of 59 or less."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(B).   Mr. Bonman asserts that he meets Listing 12.05(B) because he has a valid IQ score of 45 and the required deficits in adaptive functioning.  (Doc. 13 p. 22).  The Court disagrees.

John Goff, Ph.D., a consultative psychological examiner, evaluated Mr. Bonman and assessed a full scale IQ score of 45.  (Doc. 5-10, p. 37).   The ALJ accepted Dr. Goff's finding of a full scale IQ score of 45.  Based on his IQ score of 45, Mr. Bonman is entitled to a presumption of intellectual disability, but the Eleventh Circuit has held that "a valid I.Q. score need not be conclusive of [intellectual disability] where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior."  *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *see also Popp v. Heckler*, 779 F.2d 1497, 1500 (11th Cir. 1986) (per curiam) ("[T]he ALJ was not required to find that [the

claimant had an intellectual disability] based on the results of the IQ test.  The ALJ is required to examine the results in conjunction with other medical evidence and the claimant's daily activities and behavior.").[4]

Substantial evidence supports that ALJ's conclusion that, despite Mr. Bonman's qualifying IQ score, Mr. Bonman does not meet the criteria of Listing 12.05(B) because evidence in the record rebuts the presumption of disability. Specifically, the ALJ concluded that Mr. Bonman does not demonstrate the requisite deficits in adaptive functioning to establish an intellectual disability. (Doc. 5-3, pp. 23-25).   Regarding deficits in adaptive functioning, the Eleventh Circuit has explained:

> The Social Security Administration's Program Operation Manual System (POMS) defines "adaptive functioning" as "the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." POMS DI 24515.056(D)(2). Similarly the American Psychiatric Association defines the diagnostic measure for an intellectual disability, as "[c]oncurrent deficits or impairments in present adaptive functioning in at least two of the following areas: Communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Diagnostic and Statistical Manual of Mental Disorders IV-TR*, at 42 (4th ed. 2000). . . .

---

[4] Though he did not say so explicitly, the ALJ acknowledged the presumption, and he applied the presumption in his analysis.  *See* (Doc. 5-3, p. 23) (recognizing that Mr. Bonman "may have produced significantly low IQ scores even with full effort") *and* (Doc. 5-3, p. 23) (stating that "[t]here is no question that [Mr. Bonman's] deficits in cognitive functioning and/or learning disabilities represent life-long conditions"); *Garrett v. Astrue*, 244 Fed. Appx. 937, 939 (11th Cir. 2007) ("It was not error for the ALJ not to mention the *Hodges* presumption because the ALJ did not challenge that [the claimant's] low IQ began before age twenty-two.").

*Hickel v. Comm'r of Soc. Sec.*, 539 Fed. Appx. 980, 983 n.4 (11th Cir. 2013).

Consistent with Dr. Goff's examination, the ALJ found that Mr. Bonman has deficiencies in functional academic skills, but the ALJ found that Mr. Bonman does not demonstrate impairments in communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, work, leisure, health, and safety. (Doc. 5-3, p. 23). Substantial evidence supports this conclusion. For example, Mr. Bonman's medical records demonstrate that Mr. Bonman is not impaired in his ability to communicate or to care for his health. Those records indicate that Mr. Bonman is able to convey and understand information relating to his medical needs. (Doc. 5-9, pp. 17-45; Doc. 5-9, pp. 105-111; Doc. 5-10, pp. 2-31).[5]

The ALJ noted that that the limitations that Mr. Bonman reported to Dr. Goff in January 2013 regarding self-care and daily living are inconsistent with other evidence in the record. For example, although Mr. Bonman reported to Dr. Goff that he does not drive, the adult function reports that Mr. Bonman and his

---

[5]  In 2011 and 2012, Mr. Bonman received duplicate prescriptions for Lortab from two providers in Alabama and Mississippi. (Doc. 5-3, p. 32; Doc. 5-9, pp. 105-111; Doc. 5-10, pp. 2-31). According to the ALJ:

> [t]he planning, memory, and execution required to obtain prescriptions for controlled substances from two different providers in two different states—and keeping each from learning of the other—on a continuous basis for well over a year stands in stark contrast to the manner in which [Mr. Bonman] presented himself cognitively at Dr. Goff's evaluation and suggests a higher level of sophistication and level of function than [Mr. Bonman] alleges.

(Doc. 5-3, p. 32).

mother completed state that Mr. Bonman travels by "driv[ing] a car." (Doc. 5-7, pp. 16, 33). Medical records from Northwest Alabama Mental Health indicate that Mr. Bonman has his own transportation. (Doc. 5-9, p. 95). The record suggests that Mr. Bonman has not obtained a new driver's license since his release from prison because he has not been able to pass the driver's license exam. (Doc. 5-10, p. 36). But the record also indicates that for years, Mr. Bonman has been able to arrange transportation to dozens of medical appointments or examinations. (Doc. 5-9, pp. 2-3, 7, 17-21, 24-35, 37-38, 40-41, 47, 52, 60, 98, 99, 101, 105-111; Doc. 5-10, pp. 2-31).

Although Dr. Goff reported that Mr. Bonman has never lived independently, when Mr. Bonman completed his adult function report in July 2011, Mr. Bonman indicated that he lived alone in an apartment. (Doc. 5-7, p 30). The record suggests that Mr. Bonman's mother lives next door, and his nephew lives with him on occasion. (Doc. 5-1, p. 36). Although it appears that Mr. Bonman's family provides some assistance, treatment notes from Northwest Alabama Mental Health identified one of Mr. Bonman's strengths was having his own apartment. (R. 415).

Treatment notes indicate that Mr. Bonman was groomed appropriately during his doctors' visits. (Doc. 5-9, p. 35, 37, 41; Doc. 5-10, pp. 23, 29). And Mr. Bonman reported to a consultative examiner on August 4, 2011 that he was "able to do all personal grooming himself with mild to moderate difficulty." (Doc.

5-8, p. 85).  Dr. Beezley completed a "Friend of the Court" form in March 2012 and did not certify that Mr. Bonman needed assistance with personal care activities such as eating, toileting, bathing, grooming, dressing, taking medications, meal preparation, shopping, laundry, or housework.  (Doc. 5-8, p. 106).   Although Mr. Bonman reported that his family does his house and yard work, he also indicated that he gardens and "grows flowers very well."   Mr. Bonman shops for clothes and food on a weekly basis.   (Doc. 5-7, p. 32-34). The record contains multiple references to Mr. Bonman's muscular appearance and regular physical activity. (Doc. 5-7, p. 34; Doc. 5-9, p. 41, 44, 92-93; Doc. 5-10, pp. 2, 5, 23).

Regarding social and interpersonal skills, the ALJ acknowledged that Mr. Bonman and his mother contend that Mr. Bonman has difficulty getting along with authority figures, but they cite an isolated incident involving a single individual as the basis for that assertion.  (Doc. 5-7, pp. 19, 36).   Other evidence indicates that Mr. Bonman has no trouble socializing with others.  Mr. Bonman reported that he spends time with others, and he enjoys talking with others on a daily basis.  (Doc. 5-7, p. 34).  As of December 2012, Mr. Bonman maintained an active relationship with a girlfriend, and Mr. Bonman regularly visits friends and family in their homes.  (Doc. 5-7, p. 34; Doc. 5-10, p. 27).  Mr. Bonman's son visits him every summer.  (Doc. 5-3, p. 72).  And Mr. Bonman reported to an examining physician

that he worked as a personal trainer, which the ALJ observed is a job that requires close, personal contact with other individuals.  (Doc. 5-3, p. 25; Doc. 5-8, p. 85).

The ALJ determined that Mr. Bonman demonstrated no deficits in use of community resources because Mr. Bonman had filed for and received unemployment compensation in the past, and Mr. Bonman testified during the administrative hearing that he is aware that he is ineligible for food stamp benefits because he is convicted felon.  (Doc. 5-3, p. 25; Doc. 5-6, pp. 10-11).

The ALJ acknowledged that Mr. Bonman sought limited mental health treatment between April 2011 and July 2011 at Northwest Alabama Mental Health. (Doc. 5-3, pp. 25-26; Doc. 5-9, pp. 92-102).  However, during the examinations, Mr. Bonman exhibited appropriate memory, normal organization of thoughts, and average thought content.  He also demonstrated fair judgment and insight and displayed average intelligence.  (Doc. 5-9, p. 98-99, 101).  In October 2011, the provider terminated mental health services because Mr. Bonman had not returned for treatment in 90 days.  According to the termination notes, providers changed Mr. Bonman's April 2011 diagnosis of paranoid schizophrenia to major depressive disorder, single episode severe.  The notes also state that when Mr. Bonman last visited the facility, he had made some progress in managing his anger.  (Doc. 5-9, p. 93).  The termination notes indicate that Mr. Bonman had a GAF score of 43 in April 2011. Mr. Bonman maintains that this GAF score is evidence of a severe

impairment.  (Doc. 13, p. 27).   However, the Social Security Commissioner has noted that the GAF scale "'does not have a direct correlation to the severity requirements in our mental disorders listings.'"  *Nye v. Comm'r of Soc. Sec.*, 524 Fed. Appx. 538, 545 (11th Cir. 2013) (citing 65 Fed. Reg. at 50765-65).

Mr. Bonman argues that the ALJ improperly considered his (Mr. Bonman's) past relevant work as evidence that Mr. Bonman does not demonstrate the necessary deficits in adaptive functioning to meet Listing 12.05(B).  (Doc. 13, pp. 19-20).  The Court also is not persuaded.  The ALJ explained that Mr. Bonman has worked a variety of unskilled and low semi-skilled jobs without difficulty.  Citing *Ambers v. Heckler*, 736 F.2d 1467 (11th Cir. 1984), Mr. Bonman maintains that the ALJ erred in considering his past work.  In *Ambers*, the Eleventh Circuit held that an ALJ may not deny benefits to "a claimant who meets the disability listing for [intellectual disability] but had been previously gainfully employed with that handicap."  *Ambers*, 736 F.2d at 1468.  In other words, "[c]onsideration of the fact that [a claimant] could return to her past work is not a relevant inquiry" after a claimant has "met the Listing of Impairments in Appendix 1."  *Id.* at 1470.  Here, because the ALJ found that Mr. Bonman does not meet Listing 12.05B, the ALJ could consider Mr. Bonman's previous work experience in examining the evidence as whole.  *See Harris*, 505 Fed. Appx. at 876 (affirming ALJ's decision that, despite a qualifying IQ score under listing 12.05, the claimant did not demonstrate

12

deficits in adaptive functioning because the claimant previously worked "as a prep cook, dishwasher, food server, furniture deliverer, and truck driver, and he did not have any documented work problems attributed to his mental impairment").

The ALJ considered the entire record and devoted several pages of his decision to reviewing the evidence that supports his conclusion that Mr. Bonman does not demonstrate the requisite deficiencies in adaptive functioning to meet Listing 12.05(B).  Given the deferential standard of review that the Court must apply, the Court concludes that substantial evidence supports the ALJ's decision. *See Perkins*, 553 Fed. Appx. at 973-874 (despite the claimant's low IQ score, the ALJ properly considered the claimant's past work as a cook, activities of daily living, and other record evidence in finding that the claimant's deficits in adaptive functioning were not reflective of intellectual disability); *Garrett*, 244 Fed. Appx. at 939 (substantial evidence supported the ALJ's decision that the required deficits in adaptive functioning were not present because the claimant was able to cook simple meals, perform yard work, build model cars, play cards, and walk in the mall).

### B.  Substantial Evidence Supports the ALJ's Decision to Give Dr. Beezley's Opinion "Little Weight."

Mr. Bonman argues that he is entitled to relief from the ALJ's decision because the ALJ did not give proper weight to the opinion of Mr. Bonman's

treating physician, Dr. A.R. Beezley, in determining Mr. Bonman's RFC. (Doc. 13, p. 27). The Court disagrees.

An ALJ must give a treating physician's medical opinion "substantial or considerable weight" if supported by the evidence and consistent with the doctor's own records. *See Winschel*, 631 F.3d at 1179. An ALJ may refuse to give the opinion of a treating physician "substantial or considerable weight . . . [if] 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1240-41; *see also Crawford*, 363 F.3d at 1159.

On December 21, 2012, Dr. Beezley completed a form supplied by Mr. Bonman's attorney. Dr. Beezley opined that Mr. Bonman could not sustain an 8-hour work day and that Mr. Bonman would be limited to less than sedentary work as a result of his condition. (Doc. 5-10, p. 33). The ALJ discounted Mr. Beezley's opinion because it is inconsistent with Dr. Beezley's treatment records and other medical evidence in the record, specifically Dr. Claytor's treatment notes and Mr. Bonman's functional capacity evaluation results. (Doc. 5-3, p. 33). Substantial evidence supports this decision.

14

Dr. Beezley's opinion is inconsistent with his own treatment notes. Mr. Bonman visited Dr. Beezley eleven times between August 31, 2011 and December 12, 2012. (Doc. 5-10, pp. 2-31). During Mr. Bonman's first visit with Dr. Beezley on August 31, 2011, Mr. Bonman complained of "persistently severe" back pain that forced him to spend most of his time in a recliner. (Doc. 5-10, pp. 2-3). Upon examination, Dr. Beezley noted that there were few abnormalities outside of tight musculature in the lower back, some pain to palpitation, and pain with forced leg raising in the lower back. (Doc. 5-10, pp. 2-3). Mr. Bonman had full range of motion and muscle strength, as well as good muscle tone and volume. (Doc. 5-10, pp. 2-3). Examinations during subsequent visits to Dr. Beezley produced similar results. Mr. Bonman had a normal gait, and Mr. Bonman did not require a cane. (Doc. 5-10, pp. 5-20). Dr. Beezley encouraged Mr. Bonman to continue to exercise despite his pain, and as late as September 2011, Dr. Beezley noted that Mr. Bonman "remain[ed] very muscular and [wa]s working out with weights often." (Doc. 5-10, p. 3, 5). Dr. Beezley also discussed with Mr. Bonman "his use of pain medication and the seeming incongruency of this use and the level of his workouts." (Doc. 5-10, p. 5).

Dr. Beezley's December 2012 opinion also is inconsistent with Dr. Brian Claytor's treatment notes and corresponding MRI findings. Dr. Claytor treated Mr. Bonman for a number of months after Mr. Bonman's April 2010 work injury.

(Doc. 5-9, pp. 35-45).  Dr. Claytor found that Mr. Bonman had some tenderness over his left lumbar paraspinal region.  (Doc. 5-9, p. 35, 38, 41).   In August and September 2010, Mr. Bonman was able to walk and stand normally without a limp or instability.  Mr. Bonman also was able to flex and extend his back with only mild pain. (Doc. 5-9, p. 40-41).   September 2010 MRI results produced "no significant findings."  (Doc. 5-9, p. 41).

Dr. Claytor referred Mr. Bonman for two physical capacities evaluations in September and November 2010.  (Doc. 5-9, pp. 52-90).  Despite the examiners' belief that Mr. Bonman may have given less than full effort, results from the September 2010 examination were consistent with an ability to perform light work. (Doc. 5-9, p. 53).   Results from the November 2010 evaluation revealed that Mr. Bonman could perform medium to heavy work. (Doc. 5-9, p. 62).  On November 12, 2010, Dr. Claytor released Mr. Bonman to regular work duty.  (Doc. 5-9, p. 45).

Because Dr. Beezley's opinion is inconsistent with his own treatment and other medical records, the Court finds good cause to give the treating physician's opinion less weight.  Consequently, the ALJ's decision is supported by substantial evidence. *Crawford*, 363 F.3d at 1159-61 (finding that substantial evidence supported the ALJ's decision to discredit the opinions of the claimant's treating physicians where those physicians' opinions regarding the claimant's disability

16

were inconsistent with the physicians' treatment notes and unsupported by the medical evidence); *see also Reynolds-Buckley v. Comm'r of Soc. Sec.*, 457 Fed. Appx. 862 (11th Cir. 2012) (substantial evidence supported the ALJ's decision to give less weight to a treating physician's opinion when the doctor's opinion was "inconsistent with the medical evidence on record and was not supported by any treatment notes or by an analysis of any test results").

## V.    CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's decision is supported by substantial evidence, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner.   Accordingly, the Court affirms the Commissioner's decision to deny benefits.   The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 14, 2015.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE